**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| TRACY L. SCHADE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     Case number 4:13cv0870 TCM |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final

decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner),

denying the applications of Tracy L. Schade (Plaintiff) for disability insurance benefits

("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401-433, and for

supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b,

is before the undersigned by written consent of the parties. See 28 U.S.C § 636(c).

## Procedural History

Plaintiff applied for DIB and SSI in February 2010, alleging she was disabled as of

May 1, 2009, because of asthma and fibromyalgia. (R.[1] at 124-34, 166.) Her applications

were denied initially and after an April 2011 hearing before Administrative Law Judge

("ALJ") Bradley Hanan. (Id. at 16-28, 33-71, 74-81.) After reviewing additional evidence,

---

[1] References to "R." are to the administrative record filed by the Commissioner with her
answer.

the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Brenda G. Young, C.R.C.,[2] testified at the administrative hearing.

Plaintiff was thirty-eight years old at the time of the hearing.  (Id. at 40.)  She is 5 feet tall and weighs 223 pounds.  (Id.)  She is divorced and has three children, ages twenty-two, thirteen, and twelve.  (Id. at 40-41.)  She has custody of her two youngest children.  (Id. at 41.)  She lives with them, her oldest child (a son), and her boyfriend.  (Id.)

Plaintiff completed the eighth grade.  (Id.)  She was not in special education.  (Id. at 42.)

She has a current driver's license and has no trouble driving.  (Id. at 41.)

Plaintiff testified that she had tried returning to work in October 2009 as a housekeeper, but could not continue because she was sick.  (Id. at 42, 46.)  She did not apply for unemployment benefits.  (Id. at 42.)

Plaintiff further testified that she has good days and bad days with her asthma.  (Id. at 53.)  On a good day, she can function without becoming tired or short of breath.  (Id.)  On a bad day, she is "wheezy" and short of breath.  (Id. at 53, 54.)  Walking from one end of the house to another causes her to be short of breath.  (Id. at 54.)  She is limited in what she can do physically.  (Id.)  She has approximately two good days a week and the rest are bad.  (Id.

---

[2]"C.R.C." is a Certified Rehabilitation Counselor.

at 53.) She uses a nebulizer at least twice a day. (Id. at 54.) On a bad day, she uses it every three to four hours. (Id.) Each nebulizer treatment takes approximately fifteen minutes. (Id. at 55.) The treatments generally give her immediate relief and cause side effects of shakiness and "jitteriness." (Id.) These effects last approximately forty-five minutes. (Id.)

Plaintiff takes prednisone every day. (Id. at 56.) It causes weight gain. (Id.)

Plaintiff is also being treated for fibromyalgia. (Id. at 57.) The symptoms include muscle and joint pain. (Id. at 58.) She is "very sore and sensitive to the touch." (Id.) Her thighs and chest are affected the most; her arms are sometimes affected. (Id.) Her "back is really bad." (Id.) She cannot sit for longer than forty-five minutes without her legs going numb. (Id. at 58-59.) She does not have any difficulty standing. (Id. at 59.) If, however, her back and thighs are bothering her, she has difficulty standing up and has to do so slowly. (Id.) She has carpal tunnel syndrome and sleeps with braces on her hands. (Id. at 60.) She is receiving no other treatment for it. (Id.) She is able to button her shirts, tie her shoes, and zip up a zipper. (Id. at 63.) She has migraines at least twice a week. (Id. at 61-62.) The pain is "very, very intense." (Id. at 62.) Light and sound bother her; sometimes, she vomits. (Id.) The migraines last all day. (Id.)

On a daily basis, she gets up, gets her children ready for school, either gets them on the bus or takes them to school, comes home, sits and relaxes, tries to do dishes, and tries to vacuum. (Id. at 56.) She cannot do either chore for long without needing to take a break every ten to fifteen minutes. (Id. at 56-57.) Her two daughters have started to help her with the chores. (Id. at 57.)

Plaintiff has Medicaid, as do her children.  (Id. at 42-43.)

Plaintiff testified that she lost several jobs because of her asthma.  (Id. at 62.)

Ms. Young, testifying without objection as a vocational expert ("VE"), was asked to assume a hypothetical individual of Plaintiff's age, education, and work experience who is limited to light exertional work at most; who cannot climb ladders, ropes, or scaffolds; who can only occasionally climb ramps and stairs; and who can occasionally stoop, kneel, crouch, and crawl.  (Id. at 63, 64.)  Also, this individual should avoid moderate exposure to airborne irritants and extreme cold and vibrations, and should avoid all exposure to operationally controlled moving machinery and to hazardous machinery.  (Id. at 64.)  Asked if this individual can perform any of Plaintiff's past relevant work, the VE replied that she cannot as Plaintiff performed it.  (Id.)  She can perform the job of cashier in the variety of work settings she worked at that job as defined in the *Dictionary of Occupational Titles* ("DOT"). (Id. at 64-65.)  If this hypothetical individual is limited to moderate exposure to airborne irritants, the VE's answer would not change.  (Id. at 65.)

If the hypothetical individual is limited to sedentary work, Plaintiff's past relevant work would be eliminated as she performed it and as it is generally performed.  (Id.)  There are, however, other jobs that this individual can perform.  (Id. at 65-66.)  For instance, there are jobs in telemarketing, cashier positions at the sedentary level, and small products assembly jobs.  (Id. at 66.)  These jobs exist in significant numbers in the national and state economies.  (Id.)

If the hypothetical individual is limited to lifting no more than five pounds occasionally and cannot stand or walk for longer than ten minutes at a time, there are no jobs the individual can perform. (Id. at 67-69.) If the individual needs to use a nebulizer every three to four hours and cannot do so only on scheduled breaks, she cannot sustain employment. (Id. at 70.)

The VE stated that her testimony is consistent with the DOT or, when not, she had explained the discrepancy. (Id. at 69.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and assessments of her physical and mental abilities.

When applying for DIB and SSI, Plaintiff completed a Disability Report, disclosing that she had stopped working on January 5, 2010, because of her condition. (Id. at 166.) Her current medications included Ability (for anxiety and depression), Synthroid (for hypothyroidism), warfarin (to prevent blood clots), and Wellbutrin (for depression). (Id. at 167.)

Plaintiff also completed a Function Report. (Id. at 183-90.) With her boyfriend's help, she cares for her two youngest children, three dogs, and a bird. (Id. at 184.) She sometimes has difficulties sleeping when her chest is tight and she is wheezing and coughing. (Id.) Occasionally, she has difficulty remembering if she has taken her medication. (Id. at 185.) She prepares three meals a day; the length of time they require varies between five minutes

and two hours depending on what she is cooking.  (Id.)  It takes her all day to do the laundry and, sometimes, two days to clean the house.  (Id.)  She shops for groceries and other items once or twice a week.  (Id. at 186.)  She uses a cart to lean on.  (Id.)  Her hobbies include reading, working puzzles, and watching television.  (Id. at 187.)  How well she does them depends on how she is feeling.  (Id.)  She goes to church on Sunday and visits her sister approximately every other week.  (Id.)  Her impairments adversely affect her abilities to lift, squat, bend, stand, reach, walk, kneel, talk, hear, climb stairs, complete tasks, and use her hands.  (Id. at 188.)  She cannot walk farther than a quarter or half a block before having to stop and rest for ten minutes.  (Id.)  She can pay attention for a long time.  (Id.)  She can follow written or spoken instructions "pretty well."  (Id.)  How well she handles stress depends on what kind of day she is having; she handles changes in routine okay.  (Id. at 189.)  Her asthma has caused her to lose several jobs because it causes her to miss too many days of work.  (Id. at 190.)  Because of her asthma and fibromyalgia, she suffers from depression.  (Id.)

Plaintiff's sister completed a Function Report on Plaintiff's behalf.  (Id. at 176-82.)  Her answers generally mirrored Plaintiff's.  (Id.)

A list of Plaintiff's annual earnings for the years from 1993 through 2009, inclusive, identified her highest annual earnings as being $12,035,[3] in 1996 .  (Id. at 135.)  In four years – 1993, 1998, 2002, and 2004 – she earned less than $1,000.  (Id.)  In five of the twelve remaining years, her earnings were between $5,000 and $10,000.  (Id.)  Other than in 1996,

---

[3]All amounts are rounded to the nearest dollar.

her earnings never exceeded $10,000.  (Id.)  In the years from 1993 to 2007, inclusive, Plaintiff worked for approximately thirty-four different employers.  (Id. at 138-43.)

The relevant medical records before the ALJ are summarized below in chronological order.

Plaintiff went to the emergency room at St. Joseph Health Center in September 2002 for a non-productive cough for the past twenty-four hours, an acute onset of shortness of breath, and wheezing that had begun that morning.  (Id. at 218-40.)  She was diagnosed with acute dyspnea (shortness of breath) and an acute exacerbation of asthma, treated with medication, and discharged with instructions to call her primary care physician and with a release to return to work the next day.  (Id. at 226, 228, 234.)

In February 2004, Plaintiff consulted James Wedner, M.D., about an exacerbation of her asthma that had begun a few days earlier.  (Id. at 268-69.)  She and the rest of her family had been congested, possibly due to a flooded HVAC system.  (Id. at 268.)  She was diagnosed with acute sinusitis and prescribed an antibiotic.  (Id.)  She was to return in one month.  (Id.)

Plaintiff returned in three months, seeing Dr. Wedner for exacerbation of her asthma that had begun over the weekend.  (Id. at 266-67.)  She was prescribed a steroid and antibiotics and was to return in a few weeks if she was not better and in three months if she was.  (Id. at 266.)

Four months later, in September, Plaintiff consulted Gabriel Usry, M.D., about back pain that was occurring four times a week, each time lasting one day.  (Id. at 519-20.)  The

pain had begun five years earlier and radiated to her right leg. (Id. at 519.) She had not tried any medication. (Id.) X-rays revealed mild degenerative disc disease at L4/L5 and L5/S1. (Id. at 520.) Her asthma was stable. (Id.) Plaintiff was prescribed Motrin for the back pain and encouraged to lose weight and to exercise. (Id.) She then weighed 197 pounds. (Id. at 519.)

A few days later, Plaintiff saw Dr. Wedner for a productive cough, nasal congestion, sore throat, facial pressure, and chest tightness for the past three days. (Id. at 264-65.) Also, she had lost her voice. (Id. at 264.) She was diagnosed with an asthma exacerbation and sinusitis and prescribed steroids and antibiotics. (Id.) She was to return in one month for a follow-up visit. (Id.)

In October, Plaintiff saw Dr. Usry for complaints of low back pain and worsening depression. (Id. at 517-18.) Her depression had been improving until her daughter was diagnosed with bipolar disorder. (Id. at 517.) Her dosage of Prozac (an antidepressant) was increased; her back pain was to be monitored. (Id. at 518.)

Plaintiff next saw Dr. Wedner in February 2005, complaining of a consistent cough and facial pain and pressure. (Id. at 263.) On examination, her lungs were clear to percussion and auscultation. (Id.) He opined that Plaintiff had sinusitis and prescribed a course of steroids and antibiotics. (Id.) She was to return in three weeks. (Id.)

In August, she saw Sarah Cole, D.O., about her hypothyroidism. (Id. at 507-10.)

In November, Plaintiff consulted Mona Abousleman, M.D., a doctor in Dr. Cole's practice, about her complaints of muscle and rib pain after a fall when getting out of the tub.

(Id. at 504-06.) X-rays of her thoracic spine were normal. (Id. at 506.) A few weeks later, Plaintiff saw Dr. Cole, complaining of fatigue and back pain from the fall. (Id. at 501-03.) Her hypothyroidism was stable. (Id. at 501.) She was off all medication. (Id.) She was sleeping six to eight hours a night and taking a ninety-minute nap before work. (Id.) Her depression was also described as stable. (Id. at 502.) She was to continue taking Prozac and was prescribed another antidepressant, paroxetine. (Id.) She was also prescribed Zantac for gastroesophageal reflux disease ("GERD"). (Id.)

Plaintiff was seen by Dr. Wedner in December after being seen in the emergency room ten days earlier for her complaints of increased shortness of breath following the November accident. (Id. at 261.) She was continuing to have wheezing, coughing, and shortness of breath. (Id.) After reviewing x-rays films, Dr. Wedner doubted that Plaintiff had fractured a rib. (Id.) He prescribed her a five-day course of steroids and continued her on her current medications. (Id.) She was to return in approximately one month. (Id.)

In February 2006, Plaintiff saw Dr. Cole for abdominal pain for the past two weeks associated with intermittent vomiting for the past five days. (Id. at 497-98.) She was diagnosed with irritable bowel syndrome, prescribed Levsin, and referred to a gastroenterologist, Dr. Ruben R. Aymerich. (Id. at 498.)

Plaintiff saw Dr. Wedner later that month for an exacerbation of her asthma caused by dusting a large, five-story staircase. (Id. at 259-60.) He noted that she did not want to, and did not, wear a mask. (Id. at 259.) He prescribed her a course of steroids. (Id.) She was to return in one month for a reevaluation. (Id.)

After having a colonoscopy in March Plaintiff was diagnosed with probable irritable bowel syndrome.  (Id. at 494-96.)

In July, Plaintiff returned to Dr. Cole for treatment of abdominal pain, diarrhea, and constipation.  (Id. at 489-91.)  A subsequent ultrasound of her pelvis was normal.  (Id. at 488.)

In November, she was seen by Dr. Cole for sinus congestion and low back pain and for a refill of Flexeril and Vicodin (for her low back pain), Levoxyl (for her hypothyroidism), and Zyrtec.  (Id. at 485-87.)

In January 2007, Plaintiff complained to Dr. Cole of chest pain that had begun in the past few months; abdominal pain that had begun "years ago" and was associated with a heavy meal, nausea, and stress; and respiratory problems, including sinus congestion and a sore throat, that had begun approximately six days ago.  (Id. at 480-84.)  She did not have any chest pain, shortness of breath, or wheezing.  (Id. at 480.)  She was to be tested for hypothyroidism, prescribed over-the-counter medications for her acute sinusitis, prescribed Pepcid for her reflux esophagitis; and prescribed Zithromax, an antibiotic, and prednisone for her asthma.  (Id. at 481-82.)

In February, Plaintiff complained to Dr. Cole of worsening depression and was restarted on Prozac.[4]  (Id. at 478-79.)

---

[4]The Court notes that only two of the four pages of the visit records are included in the administrative record.

Plaintiff underwent pulmonary function tests on March 15. (Id. at 247-48.) The tests revealed a minimal obstructive defect that did not significantly improve after the administration of an aerosolized bronchodilator. (Id. at 247-48.) There was a combined obstructive and restrictive ventilatory defect. (Id. at 248.) The physician, Peter Toteur, M.D., opined that Plaintiff's obesity might be the cause of her decreased expiratory release volume ("ERV"). (Id.)

When seeing Plaintiff four days later, Dr. Cole "strongly encouraged" her to lose weight and prescribed her prednisone for her asthma. (Id. at 476-77.)

Two days later, Plaintiff reported to Dr. Wedner that she "had been doing extremely well" until a few days earlier when she developed an increased cough and some wheezing. (Id. at 257-58.) Dr. Wedner concluded that Plaintiff's asthma exacerbation was "probably due to the spring pollination season," instructed her finish taking the prednisone prescribed by her primary care physician, prescribed an antibiotic, and suggested that she use her intranasal steroids "which she has a tendency not to use." (Id. at 257.) If she did not improve in five days, she was to call. (Id.)

Plaintiff returned to Dr. Cole on April 18 for her complaints of wheezing, a cough, and shortness of breath. (Id. at 472-75.) X-rays of her chest were negative. (Id. at 472.) She was prescribed prednisone and Bactrim, an antibiotic, for her asthma. (Id. at 474.)

Plaintiff again saw Dr. Cole on April 30. This visit was for worsening hypothyroidism, improving depression, stable allergic rhinitis, and recent right hip pain. (Id. at 465-72.) The latter was better with walking, worse with sitting and lying down, and

partially relieved by Motrin.  (Id. at 465.)  Plaintiff was continued on her current medication for hypothyroidism, Levoxyl (a brand name for levothyroxine).  (Id. at 466.)  X-rays of her right hip were normal.  (Id. at 471, 472.)

Plaintiff saw Dr. Wedner in May, complaining of facial pain, postnasal drip, and productive coughs.  (Id. at 255-56.)  After examining Plaintiff, Dr. Wedner concluded that she had an exacerbation of her asthma secondary to sinus disease and placed her on a two-week course of antibiotics.  (Id. at 255.)

Plaintiff had a follow-up visit with Dr. Cole in August for her hypothyroidism.  (Id. at 458-64.)  Also, Plaintiff reported feeling tired and "'crabby.'"  (Id. at 462.)  Her sister, who had accompanied Plaintiff to the visit, opined that Plaintiff was depressed and would benefit from an increased dosage of Prozac.  (Id.)  Plaintiff had been having problems with wheezing for the past few days, and was using albuterol every four hours.  (Id.)  Dr. Cole noted that Plaintiff, then 205 pounds, was overweight.  (Id. at 462, 463.)  Plaintiff declined any diet medication or referral to a nutritionist, explaining that she was not eating many calories and was always on the go.  (Id. at 463.)  Plaintiff was continued on her current medications for her asthma.  (Id.)

Plaintiff saw Dr. Wedner on October 30 for a routine visit, reporting that her asthma had not been doing well since her last visit and that she had had to recently go to the emergency room because of severe wheezing.  (Id. at 253-54.)  She further reported that she had not been able to go to work because of a constantly-working fireplace and would not go back to work until her asthma was under control.  (Id. at 253.)  On examination, her lungs had

diffuse wheezing bilaterally. (Id.) She was given a nebulizer treatment, prescribed prednisone, and was to return in two weeks. (Id. at 253-54.)

A computed tomography ("CT") scan taken in November of Plaintiff' sinuses revealed hypoplastic frontal sinuses and minimal chronic right maxillary sinus inflammatory disease. (Id. at 246.)

Plaintiff had a well-woman examination by Dr. Cole in January 2008. (Id. at 449-57.) Her concerns included intermittent chest pain for the past several months when she was anxious or under stress. (Id. at 449.) The pain lasted for five to ten minutes. (Id.) Other concerns included low back pain and spasm after standing for longer than thirty minutes and depression and anxiety. (Id.) Plaintiff was interested in stress management. (Id.) On examination, she had appropriate judgment, mood, and affect. (Id. at 451.) She was tender in her left lower back. (Id. at 450.) Her chest pain was thought to be anxiety related. (Id. at 452.) Her asthma was stable. (Id.) Plaintiff was to return in one year. (Id.)

Plaintiff returned in November, complaining of a cough, congestion, sore throat, and postnasal drip for the past two weeks and of right foot pain for the past month. (Id. at 338-46, 527, 550-58.) Also, she was concerned about an outbreak of pertussis (whooping cough) at the school where her children attended and she worked. (Id. at 340.) X-rays of her right foot were negative. (Id. at 342, 527.) She was advised to drink lots of fluid, rest, and use a vaporizer. (Id. at 340.) She was also prescribed antibiotics. (Id.) She was to take Advil as needed for her foot pain and to return in three weeks or sooner if her symptoms did not improve or worsened. (Id. at 340, 345.)

During Plaintiff's annual gynecologic exam on January 22, 2009, Dr. Cole noted that Plaintiff had been out of her medications for a few days. (Id. at 347-60, 559-72.) Although she was generally feeling well, she reported bilateral foot pain and was referred to a podiatrist for an evaluation of her plantar fasciitis. (Id. at 348, 350.)

On January 28, Plaintiff was seen in the emergency room at Progress West Healthcare Center for complaints of vomiting, diarrhea, and abdominal pain that had started the night before. (Id. at 283-295.) She was diagnosed with gastroenteritis and given intravenous ("IV") drips of Zofran (to prevent nausea and vomiting) and Toradol (a nonsteroidal anti-inflammatory drug). (Id. at 287-88, 290, 293, 294.) A few hours later, she was feeling better and wanted to go home. (Id. at 290.) She was then discharged with prescriptions for Reglan, for nausea, and Vicodin, for pain. (Id. at 288, 290, 294.)

Plaintiff consulted Dr. Cole on February 11 for her complaints of congestion, sneezing, a dry cough, and hoarseness for nine days. (Id. at 361-66, 573-78.) Her voice was hoarse. (Id. at 362.) The same symptomatic therapy was suggested as had been at her November 2008 visit. (Id. at 363.) And, her taper of prednisone was readjusted. (Id.)

Two weeks later, Plaintiff consulted Dr. Wedner for an acute exacerbation of her asthma evidenced by wheezing and shortness of breath for the past three weeks. (Id. at 251-52, 278.) On examination, her lungs had mild inspiratory and end-expiratory wheezing. (Id. at 251.) Pulmonary function tests indicated that "her asthma [was] actually doing quite well." (Id. at 251, 252, 278.) To relieve her congestion, Plaintiff was prescribed a nasal spray to be used once a day. (Id. at 252.)

Two days later, Plaintiff returned to the emergency room at Progress West after having an allergic reaction to tapering her doses of prednisone. (Id. at 296-305.) She was given IV drips of Toradol and discharged with instructions to follow-up with Dr. Cole the next day to readjust the tapering. (Id. at 300, 302, 303.)

Plaintiff did see Dr. Cole the next day. (Id. at 367-72, 579-84.) She was instructed to continue her prednisone taper and call if the symptoms persisted longer than two weeks. (Id. at 369.)

Plaintiff returned to Dr. Cole on March 26, complaining of congestion, a sore throat, productive cough, hoarseness, and itching in her eyes for the past five days. (Id. at 374-78, 585-90.) She was scheduled by Dr. Wedner to have a CT of her sinuses the next week. (Id. at 374.) She also complained of worsening anxiety and irritability when taking Wellbutrin. (Id.) Consequently, she had stopped taking it and had resumed taking Celexa, an antidepressant, which was working well. (Id.) Her Celexa prescription was refilled. (Id. at 375.)

The CT scan performed on March 31 indicated that Plaintiff's sinuses were unchanged since November 2007. (Id. at 245.)

Plaintiff saw Dr. Cole on April 23 after being bitten in the chin and hands by her macaw. (Id. at 379-85, 591-98.) The pain was moderate. (Id. at 380.) The wounds were cleaned and steri-strips were applied. (Id. at 381.) An antibiotic was prescribed. (Id. at 382.) One week later, Plaintiff report that the bites were "much better" and less painful. (Id. at 386-91, 599-603.) She had been told by physical therapy that she had bilateral innominate

dysfunction and muscle imbalance in her pelvic area. (Id. at 387.) She reported that the therapist thought she should remain on short-term disability and then resume working part-time; she concurred. (Id.) She also had bilateral neck pain and tension headaches. (Id.) They were not relieved by acetaminophen or Motrin. (Id.) On examination, she had a limited range of motion and tenderness in her back. (Id. at 388.) Straight leg raises were negative bilaterally.[5] (Id.) She was tender in her right elbow and was given a tennis elbow strap. (Id.) She was to continue with the physical therapy, rest, and nonsteroidal anti-inflammatory medications. (Id.) Also, she was to remain off work until June 4 and then resume working part-time. (Id.)

Plaintiff reported to Dr. Wedner on May 12 that she was "actually doing quite well." (Id. at 249-50, 270.) She had recovered from the earlier infection and was "not having much in the way of wheeze, cough or shortness of breath." (Id. at 249.) She was not waking up at night and was walking on level ground as far as she wanted. (Id.) She was, however, having a little postnatal drip and "itchy, scratchy, watery eyes," particularly when the pollen levels were high. (Id.) On examination, she had no wheezing, rales, or rhonchi. (Id.) Her extremities were not swollen. (Id.) Pulmonary function testing "was basically normal." (Id.) She was continued on her current medical regimen. (Id.)

---

[5]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

On May 29, Plaintiff reported to Dr. Cole that her back pain was better and had "nearly resolved" with physical therapy. (Id. at 393-99, 604-11.) Her right elbow pain was worse, however, and had not been relieved by wearing the elbow strap. (Id.) Because of the elbow pain, she was unable to use her right arm. (Id.) Also, she had had recurrent wheezing and, as of the day before, shortness of breath on exertion. (Id.) She did not have a fever. (Id.) She had bilateral diffuse muscle pain, which was worse with stress and sleep deprivation. (Id. at 394.) On examination, Plaintiff had mild swelling and severe tenderness in her right elbow. (Id.) She had a normal range of motion in her cervical, thoracic, and lumbar spine and no tenderness. (Id.) She was to continue physical therapy for her back for another nine to twelve visits. (Id.) She was also to do physical therapy for her elbow and to continue wearing the strap. (Id.) Her depression was not worse. (Id.) She was alert and oriented to time, place, and person and was not in acute distress. (Id.) Dr. Cole diagnosed Plaintiff with lateral epicondylitis (tennis elbow); unspecified asthma, with exacerbation; lumbar back sprain; and fibromyalgia. (Id.) She concluded that Plaintiff needed to be off work because of her tennis elbow. (Id.) She was to began a trial of a tetracyclic antidepressant ("TCA") "for depression/fibromyalgia" and to concurrently wean off of Celexa. (Id.) She was also to use a "prednisone burst" and short-acting albuterol for her asthma. (Id.) Dr. Cole gave Plaintiff a steroid injection in her right elbow. (Id. at 395.)

The next week, on June 5, Plaintiff saw Marsha K. Mertens, M.D., another doctor in Dr. Cole's practice, because her asthma exacerbation had only partially resolved. (Id. at 400-

06, 612-18.) She was diagnosed with a viral upper respiratory infection and prescribed Sudafed in addition to the medications previously prescribed for her asthma. (Id. at 402.)

Plaintiff had a follow-up appointment with Dr. Cole on July 2. (Id. at 407-13, 619-25.) Her low back pain was continuing to improve. (Id. at 408.) She had been released from physical therapy and was to do a home exercise program. (Id.) She wanted a note to return to work on August 1. (Id.) A current episode of depression, described as a recurring problem, had started a few days earlier when her truck was set on fire and was gradually worsening. (Id.) She was having problems sleeping and eating. (Id. at 409.) She was anxious and tearful. (Id.) She had not tried anything to alleviate the symptoms. (Id.) On examination, she was nervous and anxious. (Id.) Her behavior, insight, judgment, cognition, and memory were all normal. (Id.) Her speech was "rapid and/or pressured." (Id.) She was diagnosed with unspecified hypothyroidism, stress reaction, and major depressive disorder, recurrent, mild, and prescribed lorazepam, used for the treatment of anxiety disorders, and levothyroxine for the hypothyroidism. (Id.) She was released to return to work on August 1. (Id.) She was also referred to a counselor and given a short supply of benzodiazepine for acute anxiety. (Id. at 410.) Her daily antidepressant was to be reviewed after her acute stress reaction had resolved. (Id.)

In November, Plaintiff went to the Progress West emergency room with complaints of a painful, swollen right knee after tripping over a dog the night before. (Id. at 311-22.) She had gone to work, but the knee had become worse during the day. (Id. at 313.) On examination, she had a full range of motion and no swelling in all four extremities. (Id. at

314.)  X-rays of her right knee were negative.  (Id. at 322.)  She was diagnosed with a contusion of the right knee.  (Id. at 315, 318.)  The knee was wrapped.  (Id. at 316.)  Plaintiff was discharged with a prescription for Vicodin and instructions to follow up with a Dr. Powell in one week.  (Id. at 315, 316, 318, 319.)

Plaintiff returned to the emergency room on December 3 with complaints of an asthma attack for the past two days that her home medication did not relieve.  (Id. at 323-33.)  Plaintiff was given a prescription for prednisone, which she was to taper down over the next twenty-five days.  (Id. at 326, 331.)  And, she was to see her primary care physician the next day if she was not improving.  (Id. at 327.)

Plaintiff saw Dr. Cole on December 14 for sinus congestion and generalized muscle pain she had had for the past six days.  (Id. at 414-20, 626-32.)  Her thyroid medications were refilled.  (Id.)

Two weeks later, a magnetic resonance imaging ("MRI") was done of Plaintiff's brain to investigate the cause of her headaches.  (Id. at 524.)  It was normal.  (Id.)

In January 2010, Plaintiff had her annual well-woman examination by Dr. Cole.  (Id. at 421-27, 633-39.)

Plaintiff had a follow-up visit with Dr. Cole on February 3 after undergoing pulmonary function tests.  (Id. at 428-35, 640-47.)  The tests were positive for mild obstructive disease.  (Id. at 430.)  Plaintiff reported that she had run out of prednisone the week before and was wheezing daily.  (Id. at 429.)  Her wrist pain had improved by wearing splints at night; her right elbow pain had not.  (Id.)  Because of the pain, she could not hook her bra or wash her

hair. (Id. at 430.) She did not take nonsteroidal anti-inflammatory medications because they caused epigastric pain. (Id.) Her diagnoses included severe, persistent asthma, poorly controlled; tension headache; neck and back pain; medial epicondylitis; and GERD. (Id.) She was given osteopathic manipulative treatment ("OMT") for her headaches and a steroid injection in her right elbow. (Id. at 431.)

Nine days later, Plaintiff again saw Dr. Cole, complaining of recurrent right upper quadrant pain during the past week, unrelieved by over-the-counter medication and triggered by eating heavy foods. (Id. at 436-42, 648-54.) Her asthma was gradually improving. (Id. at 437.) She had been unable to work because of asthma flare-ups. (Id. at 437-38.) She was still having problems with her right elbow and was to try physical therapy. (Id. at 438.) Dr. Cole suspected cholelithiasis (gallstones) compared to GERD and ordered an ultrasound of Plaintiff' right upper quadrant to resolve the question. (Id.) The ultrasound was normal. (Id. at 522-23, 525.)

Plaintiff reported to Dr. Cole on March 3 that she had stopped taking Elavil because she was taking Flexeril, a muscle relaxant, more often and was under increased stress due to concerns about her daughter's health, her job, and her car breaking down the month before. (Id. at 443-48, 655-60.) Her right upper quadrant pain was not relieved by Zantac. (Id.) Dr. Cole noted that the ultrasound was within normal limits. (Id.) Plaintiff reported that she had had minimal improvement in her right elbow pain after two physical therapy sessions. (Id. at 445.) She had neck tension and requested an osteopathic evaluation and treatment. (Id.) On examination, she had an anxious, but congruent, mood and affect. (Id.) Her insight and

judgment were appropriate; her speech was normal. (Id.) She cried. (Id.) Her physical therapy order was revised to include hand therapy for carpal tunnel syndrome. (Id.) She was to resume Elavil. (Id.) She was again given OMT and was to continue taking prednisone. (Id. at 446.)

On March 23, Plaintiff reported to Dr. Cole that her breathing was stable, but she was frustrated by her weight gain while on prednisone. (Id. at 701-08.) Her bilateral carpal tunnel syndrome was "somewhat better" with physical therapy, but she still had occasional numbness. (Id.) Her right elbow pain was the same, and caused severe limitations in her activities of daily living. (Id. at 704.) Her depression and anxiety were also the same, regardless of her having resumed taking Elavil. (Id.) She was having economic, emotional, and relationship difficulties. (Id.) On examination, her mood, affect, insight, and judgment were all appropriate. (Id.) Her speech was normal. (Id.) Her right elbow was moderately limited in its range of motion by pain. (Id.) It was not swollen or warm. (Id.) Her diagnoses included carpal tunnel syndrome; severe, persistent asthma, poorly controlled; elbow pain; and major depressive disorder, recurrent, mild. (Id.) She was to have an electromyogram ("EMG") and nerve conduction study to investigate the continuing elbow pain and carpal tunnel syndrome symptoms. (Id. at 705.) Her dosage of amitriptyline (the generic form of Elavil) was doubled to help relieve her mood and fibromyalgia symptoms. (Id. at 704.)

Plaintiff returned to Dr. Cole two days later with complaints of left-sided chest tightness that had begun two nights earlier when she took the stronger dose of amitriptyline. (Id. at 709-18.) The pain had radiated to her right shoulder and neck and had gradually

improved over twenty-four hours.  (Id. at 711.)  She was currently asymptomatic.  (Id. at 711-12.)  An electrocardiogram ("EKG") had no significant result and was "reassuring."  (Id. at 714.)  The amitriptyline was discontinued; citalopram (the generic form of Celexa) was prescribed.  (Id.)

Plaintiff saw Dr. Cole on April 5 for an exacerbation of her asthma that had begun the day before.  (Id. at 719-26.)  She had moderate wheezing, congestion, and hoarseness.  (Id. at 721.)  She was compliant with her asthma medications.  (Id.)  She reported that her mood was "somewhat improved" on the Celexa.  (Id.)  Her right elbow pain was the same.  (Id.)  Her asthma medications were changed; her Celexa dosage was doubled.  (Id.)  X-rays of her right elbow were normal.  (Id. at 726.)

Plaintiff saw Evelio E. Sardina, M.D., on April 20 for evaluation and treatment of her asthma.  (Id. at 671-78.)  Her symptoms included a nonproductive cough, wheezing, shortness of breath, chest tightness, itchy eyes, and nasal congestion.  (Id. at 671.)  The last exacerbation of her asthma had occurred two weeks earlier.  (Id. at 675.)  A typical exacerbation included shortness of breath, a nonproductive cough, and wheezing; an episode usually lasted two weeks.  (Id.)  She lived in a mobile home with three dogs, a macaw, and spots of mold or mildew.  (Id. at 675-76.)  On examination, she was positive for a cough, wheezing, and shortness of breath on exertion.  (Id. at 676.)  She weighed 221 pounds.  (Id.)  She was active, alert, cooperative, and in no distress.  (Id.)  She was diagnosed with vocal cord dysfunction, anxiety, and severe GERD.  (Id. at 677.)  It was thought she had asthma.  (Id.)  Dr. Sardina noted that Plaintiff's cough and wheezing "completely disappeared" during

the visit as he was discussing vocal cord dysfunction.  (Id.)  She was to be referred to a speech pathologist for confirmation and therapy suggestions.  (Id.)  She was also to return in one month.  (Id.)

Six days later, Plaintiff complained to Dr. Cole of persistent symptomatic episodes of hypoglycemia in the morning – the episodes were resolved when she ate snacks – and of worsening right upper quadrant pain.  (Id. at 727-33.)  She had seen the pulmonologist; her asthma was "currently well controlled."  (Id. at 729.)  Her insulin levels were checked.  (Id. at 730, 733.)

Plaintiff saw Dr. Mertens on June 3 for left thumb pain after shutting the car door on it; x-rays were normal.  (Id. at 734-41.)  She had a follow-up visit with Dr. Cole three weeks later.  (Id. at 742-48.)  Also, Plaintiff reported that her right upper quadrant pain had decreased in frequency and that the Celexa was not working as well.  (Id. at 744.)  She was under stress and was reapplying for disability.  (Id.)  Trazodone and Ativan were prescribed to help with her insomnia, anxiety, and panic attacks.  (Id. at 745.)  Her prescription for Celexa was renewed.  (Id.)

On July 22, Plaintiff reported to Dr. Cole that her depression was unchanged and she wanted to increase the dosage of Celexa.  (Id. at 749-55.)  She was "coping a little better but still sad and irritable with ongoing stressors."  (Id. at 751.)  She was wheezing that day, but not coughing.  (Id.)  She had sprained her left ankle two weeks earlier.  (Id.)  Her dosage of Celexa was increased.  (Id. at 752.)

In August, Plaintiff informed Dr. Cole that her asthma was worse, her prednisone dosage was increased. (Id. at 756-62.)

In September, Plaintiff consulted Dr. Cole for low back pain for the past two days when bending or lifting; the pain had started when she was doing yard work. (Id. at 763-68.) Her asthma was worse, e.g., she was wheezing with activities of daily living, after she ran out of medications and could not afford to refill her prescriptions. (Id. at 765.) On examination, she appeared to be in mild to moderate pain and walked with an antalgic gait. (Id.) She had a painful and reduced range of motion in her lumbar spine. (Id.) Straight leg raises were negative bilaterally. (Id.) She was diagnosed with lumbar strain and somatic dysfunction of her thoracolumbar and sacral spine. (Id.) She wished to proceed with OMT. (Id.) Dr. Cole suggested she investigate sources for financial aid for her medications. (Id.)

In October, Plaintiff complained to Dr. Cole of "'charlie horses'" in her jaw, arms, and toes; worsening carpal tunnel syndrome in her right arm; headaches for the past three weeks; and bruising on her arms and legs for the past month. (Id. at 769-81.) She had not been doing her stretches or wearing a wrist splint at night. (Id.) Dr. Cole suspected that the headaches were caused by sinusitis. (Id. at 772.) Suspecting that the muscle aches were recurrent fibromyalgia pain, she prescribed a trial course of Soma. (Id.) Plaintiff was to resume doing wrist extension exercises and wearing a wrist splint at night. (Id.)

Plaintiff returned to Dr. Cole on November 12 for treatment of her dry cough with wheezing, sore throat, headaches, sinus pressure, ear ache, and bilateral flank pain. (Id. at 782-90.) She was using an albuterol nebulizer but was out of another asthma medication,

Atrovent. (Id. at 785.) Plaintiff was diagnosed with chronic sinusitis and continued on her current medications with the exception of her nasal steroid. (Id. at 786.) The steroid was changed. (Id.) She was to return in two months or sooner if her symptoms did not improve. (Id. at 789.)

Plaintiff returned in two weeks, reporting persistent coughing, congestion, and left ear pain. (Id. at 791-96.) Also, she had low back pain and right leg numbness and tingling for the past seven days. (Id. at 793.) On examination, tenderness and mild muscle spasms were noted in her right lumbar spine. (Id.) Sudafed was added to her medications and she was given instructions on back and joint exercises. (Id.)

Plaintiff next saw Dr. Cole on January 17, 2011, telling her that the exercises were helping her low back pain and the Sudafed was helping her ears, but not her sinuses. (Id. at 808-15.) She had had several choking exercises during the past four to six weeks. (Id. at 810.) She was treated for chronic sinusitis and was to be referred to a gastroenterologist for an EMG to investigate her dysphagia (difficulty swallowing). (Id.)

Two days later, Plaintiff was seen by Muddasani B. Reddy, D.O., a gastroenterologist, for her complaints of dysphagia for the past two to three months. (Id. at 682-86.) She also had a history of esophageal reflux and dyspepsia (indigestion), the symptoms of which improved with prevacid. (Id. at 682.) She had chronic sinusitis and was on prednisone maintenance for her asthma. (Id.) On examination, she did not have a sore throat, red eyes, a cough, chest pain, or joint pain. (Id. at 683-84.) She did have shortness of breath and chest tightness from her asthma, difficulty swallowing, and muscle pain. (Id.) She was obese. (Id.

at 684.)  She had a normal mood, affect, and behavior.  (Id.)  She was to continue taking the prevacid and was to have an esophagogastroduodenoscopy ("EGD").  (Id.)  Dr. Reddy's impression after the EGD was of a hiatal hernia.  (Id. at 687-88.)  Biopsies revealed changes and inflammation consistent with GERD.  (Id. at 690-92.)

Plaintiff returned to Dr. Reddy for a follow-up appointment on February 11, complaining of right upper quadrant pain, abdominal bloating, and diarrhea "for many months."  (Id. at 679-81.)  Her symptoms were worse when she ingested milk products.  (Id. at 679.)  She had stopped taking the prevacid because it was not helping.  (Id.)  She reported feeling not well "overall."  (Id.)  She was then taking antibiotics for sinusitis.  (Id.)  She was tearful and anxious.  (Id. at 680.)  Dr. Reddy gave her samples of Dexilant, a proton pump inhibitor, for her GERD and scheduled her for a return visit in two weeks.  (Id.)  A breath hydrogen test indicated lactose intolerance.  (Id. at 689.)  Plaintiff was to follow a lactose free diet for one month to see if her symptoms improved.  (Id.)

Plaintiff had her annual well-woman examination by Dr. Cole on February 22, reporting that she was feeling well.  (Id. at 816-24.)

Plaintiff was evaluated by a speech pathologist on February 28.  (Id. at 693-700.) Plaintiff reported having had "a high frequency of coughing and choking episodes in past years with an average of 4-5 coughing/choking episodes per week."  (Id. at 697.)  These episodes triggered asthma symptoms.  (Id.)  Also, she had had a three to four week episode the previous fall during which she had a complete loss of voice and hoarseness.  (Id.)  She further reported that a pulmonologist had indicated that she had "'voice box problems,'" not

asthma. (Id.) She had difficulty with such tasks as walking. (Id.) On examination, she had significantly decreased breath support for phonation, or making sounds; her breath support for conversational speech was within normal limits, as were her intonation, voice quality, articulation, speech intelligibility, loudness, and resonation. (Id. at 697-98.) It was concluded that she had mild pharyngeal dysphagia characterized by mild coughing and/or clearing of the throat. (Id. at 698.) She did not have any signs of a voice disorder. (Id.) It was recommended that she receive speech therapy services for three days a week for approximately two months. (Id.) Her rehabilitation prognosis was good. (Id. at 699.) Plaintiff declined the therapy suggestion, deferring such until she had been seen by a gastroenterologist to "assess possible complications related to reflux and vocal fold dysfunction." (Id. at 700.)

Also before the ALJ were assessments of Plaintiff's mental and physical impairments and their resulting limitations.

In May 2010, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Jeffrey Wheeler, M.D., a medical consultant. (Id. at 664-69.) The primary diagnoses were vocal cord dysfunction, obesity, fibromyalgia, carpal tunnel syndrome, and tennis elbow. (Id. at 664.) There were no secondary diagnoses. (Id.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and sit, stand, or walk for approximately six hours in an eight-hour day. (Id. at 665.) Her abilities to push and pull were otherwise unlimited. (Id.) She had postural limitations of never climbing ladders, ropes, and scaffolds and only

occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs. (Id. at 666.) She had no manipulative, visual or communicative limitations. (Id. at 666-67.) She had environmental limitations of needing to avoid concentrated exposure to extreme cold and to vibrations. (Id. at 667.)

In March 2011, Dr. Cole completed a Medical Source Statement on Plaintiff's behalf. (Id. at 825-26.) The only diagnosis was severe persistent asthma. (Id. at 825.) Plaintiff was limited to frequently or occasionally lifting five pounds or less. (Id.) She could stand or walk for a total of four hours during an eight-hour workday and could do either continuously for only five minutes. (Id.) She could sit for a total of eight hours and continuously for one hour. (Id.) She could not push or pull, including using foot or hand controls. (Id.) She could occasionally bend, kneel, reach, handle, and finger. (Id. at 826) She should avoid heights, temperature extremes, and fumes and should only occasionally be exposed to machinery and vibrations. (Id.) Dr. Cole noted that Plaintiff's asthma symptoms worsened with "even mild exertion" and that she needed to use a quick-relief inhaler several times a day. (Id.) Her symptoms were exacerbated by allergic rhinitis, chronic sinusitis, and vocal cord dysfunction. (Id.) Asked about the need for rest periods, Dr. Cole responded that the query was not applicable. (Id.)

On a Medical Assessment of Ability to Do Work-Related Activities (Mental), Dr. Cole opined that Plaintiff had a good ability to deal with the public, use her judgment, deal with work stresses, behave in an emotionally stable manner, and relate predictably in social situations. (Id. at 827-28.) She had an unlimited or very good ability to follow work rules,

relate to her co-workers, interact with supervisors, function independently, maintain attention and concentration, maintain her personal appearance, and demonstrate reliability.  (Id.)  She also had an unlimited or very good ability to understand, remember, and carry out simple, detailed, or complex instructions.  (Id.)

## The ALJ's Decision

The ALJ first determined that Plaintiff met the insured status requirement of the Act through September 30, 2014, and had not engaged in substantial gainful activity since her alleged onset date of May 1, 2009.[6]  (Id. at 21.)  Although she had worked after that date, the work did not rise to the required level of substantial gainful activity.  (Id.)

The ALJ next found that Plaintiff had severe impairments of asthma, morbid obesity, and fibromyalgia.  (Id. at 22.)  She did not have a medically determinable back impairment, and her carpal tunnel syndrome and depression had no more than a minimal effect on her ability to work for twelve consecutive months.  (Id.)  She did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity.  (Id.)

Next addressing Plaintiff's residual functional capacity ("RFC"), the ALJ determined that she could perform sedentary work[7] except she could not climb ropes, ladders, or scaffolds and could only occasionally stoop, kneel, crouch, crawl, or climb ramps and stairs.  (Id.)  She

_____

[6]The ALJ rendered his decision in June 2011.

[7]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing."  20 C.F.R. § 404.1567(a).

had to avoid moderate exposure to extreme cold, airborne irritants, and poorly ventilated areas and avoid concentrated exposure to extreme vibration.  (Id.)  She had to avoid all operational control of moving machinery, the use of hazardous machinery, and working at unprotected heights.  (Id.)

After summarizing Plaintiff's testimony and the medical records, the ALJ addressed Dr. Cole's assessment, finding its severe restrictions to be lacking any medical basis.  (Id. at 22-25.)  The ALJ noted that Dr. Cole concluded that Plaintiff could not use hand or foot controls, but the record reflected that she drove on a regular basis.  (Id. at 25.)  The ALJ also noted that Plaintiff's weight was fairly stable since her alleged onset date; that Dr. Cole stated she needed to use an inhaler several times a day, but not that she needed a nebulizer machine; and that no doctor had reported that Plaintiff's fibromyalgia precluded work that was not physically demanding.  (Id.)  Pulmonary function tests showed only a minimal obstructive ventilatory defect.  (Id.)

Addressing Plaintiff's subjective complaints, the ALJ found that her earnings record did not support those complaints and that she could engage in activities of daily living that were inconsistent with those complaints, including being the primary caregiver for her children and doing such household tasks as laundry, cleaning, vacuuming, and preparing a meal that can take two hours.  (Id. at 26.)  The ALJ specifically disclaimed any inference that Plaintiff did not have pain and breathing difficulties, but concluded that those difficulties restricted, but did not preclude, her ability to work.  (Id.)  The ALJ further concluded that, with her RFC, Plaintiff cannot return to her past relevant work.  (Id.)  With her age, limited

education, and RFC, she can perform work that exists in significant numbers in the national economy.  (Id. at 26-27.)

She was not, therefore, disabled within the meaning of the Act.  (Id. at 28.)

### Additional Medical Records Before the Appeals Council

After the ALJ rendered his decision, Plaintiff submitted additional medical records to the Appeals Council.

In May 2010, Plaintiff underwent a hepatobiliary imaging with gallbladder ejection fraction; the imaging showed no evidence of gall stones or of a common bile duct obstruction. (Id. at 831.)

A CT scan of her sinuses taken in November 2010 was normal.  (Id. at 832-33.)

On March 9, 2011, Plaintiff underwent a video swallow with speech pathology to investigate acid reflux and food regurgitation.  (Id. at 834.)  The speech pathology department was to submit a report of its findings.  (Id.)  No report is in the record.

Plaintiff again saw Dr. Reddy on March 28 for a follow-up appointment for her irritable bowel syndrome, right upper quadrant pain, diarrhea, dysphagia, heartburn, and lactose intolerance.  (Id. at 829-30.)  She had a normal mood, affect, and behavior.  (Id. at 829.)  Her heartburn had improved on Dexilant; the prescription was renewed.  (Id. at 829, 830.)  She was to be scheduled for a colonoscopy.  (Id. at 830.)

Three days later, she saw Dr. Cole about an exacerbation of her asthma that had begun thee days earlier with moderate to severe wheezing.  Compliance with a medical regimen, including use of her six current asthma medications, was discussed.  (Id. at 840-48.)

On May 18, Plaintiff consulted Dr. Cole about non-radiating low back pain for the past two weeks.  (Id. at 850-59.)  She was to be referred to physical therapy if the pain did not improve.  (Id. at 854.)  X-rays of her lumbar spine revealed multilevel degenerative disc and facet changes, most pronounced at L4-L5 and L5-S1.  (Id. at 836, 849.)

In June, Plaintiff went to Dr. Cole for an osteopathic evaluation and treatment for persistent bilateral low back pain that radiated to her right buttock and leg.  (Id. at 860-69.)  The pain was worse with sitting or standing for prolonged periods.  (Id. at 864.)  She reported that physical therapy had been helpful initially, but sinus pain, pressure, and a nonproductive cough had prevented her from attending for the past week and from doing home exercises.  (Id.)  OMT was performed.  (Id. at 865.)  Plaintiff was to resume physical therapy.  (Id.)

As noted in Dr. Cole's records, Plaintiff attended physical therapy.  She had thirteen physical therapy sessions from August 11 to October 20, 2011.  (Id. at 870-96.)  Her pain level varied between a four and an eight on a ten-point scale.  (Id.)  Six of the thirteen ratings were a six; three were a four; one was an eight; the last three were a five.  (Id.)

Shortly after ending physical therapy, Plaintiff saw Dale J. Klein, M.D., three times for pain management.  (Id. at 898-908.)  Plaintiff reported at the first, October 25, 2011, visit that she had had low back pain for one year.  (Id. at 905.)  The pain was exacerbated by activities of daily living such as walking, bending, and standing and temporarily relieved by physical therapy, ice, and nerve stimulation.  (Id.)  Straight leg raises were negative on the left and positive on the right.  (Id. at 907.)  She could stand from a seated position and could walk without assistance.  (Id.)  She could stand heel and toe.  (Id.)  Dr. Klein opined that

Plaintiff's symptoms were most consistent with lumbar radicular syndrome and lumbar facet arthropathy. (Id. at 908.) At the next, November 11, session, Plaintiff was given therapeutic nerve stimulation and diagnosed with myofascial pain syndrome. (Id. at 902-04.) Plaintiff reported on November 30 that the procedure had "provided mild pain relief for a couple hours duration." (Id. at 898-901.) She was given decompression therapy, following which she was diagnosed with herniated disc/lumbar radiculopathy and myofascial pain syndrome. (Id. at 900-01.)

In July 2012, Plaintiff consulted Dr. Reddy about blood in her stools. (Id. at 909-11.) She was to be scheduled for a colonoscopy. (Id. at 911.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)[8]). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

---

[8]Unless otherwise indicated, all citations to the Code of Federal Regulations are to the revision in effect at the time of the ALJ's decision.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's

complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

### Discussion

Plaintiff argues that the ALJ erred (1) when failing to include in his RFC findings the limitations found by Dr. Cole; (2) when assessing her credibility; and (3) by failing to order a mental consultative examination and by failing to find limitations in her RFC because of her depression, anxiety, and crying spells. Plaintiff further argues that the Commissioner erred by failing to sufficiently consider the evidence she submitted to the Appeals Council.

Dr. Cole's Assessment. Almost two years after Plaintiff's alleged onset date of May 2009, Dr. Cole completed a Medical Source Statement ("MSS") on her behalf. The only

diagnosis was severe persistent asthma.  According to Dr. Cole, this impairment resulted in, among other things, Plaintiff being limited to lifting five pounds, standing or walking continuously for only five minutes[9] and for a total of four hours during an eight hour workday, siting continuously for one hour and for a total of eight hours, and never using foot or hand controls.  On a separate questionnaire, Dr. Cole described Plaintiff as having, at worst, a good ability to perform several work-related mental activities.

It is undisputed that Dr. Cole is Plaintiff's treating physician, having first seen her in August 2005 and being her only consistent health care provider thereafter.  See 20 C.F.R. §§ 404.1502, 416.902 (defining "treating source" as a claimant's "own physician, psychologist, or other medical source who provides [claimant], or has provided [claimant] with medical treatment or evaluation and who has, or has had, an ongoing relationship with [claimant].").  "The regulations provide that if the ALJ finds 'that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence in [the applicant's] record,* [the ALJ] will give it controlling weight.'"  **Wagner**, 499 F.3d at 848-49 (quoting 20 C.F.R. § 404.1527(d)(2)).  Thus, "while a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole."  **Id.** at 849 (internal quotations omitted).

---

[9]In her supporting brief, Plaintiff refers to this continuous restriction to being both ten minutes and five minutes.  Dr. Cole's restriction is to five minutes.

Dr. Cole's assessment of Plaintiff's exertional limitations is clearly inconsistent with her own treatment notes. Her assessment was written one month after Plaintiff had last seen her. This visit was for an annual well-woman examination, during which Plaintiff reported that she was feeling well. The visit before this, in January 2011, was for sinus-related problems. Plaintiff had last seen Dr. Cole for asthma in November 2010, at which time she had reported that she was out of one of her asthma medications. Two months earlier, Plaintiff consulted Dr. Cole about back pain caused by doing yard work. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." **Davidson v. Astrue**, 578 F.3d 838, 843 (8th Cir. 2009); accord **Turpin v. Colvin**, 750 F.3d 989, 993 (8th Cir. 2014). See also **Anderson v. Astrue**, 696 F.3d 790, 794 (8th Cir. 2012) (affirming ALJ's rejection of treating physician's opinions about claimant's exertional limitations that "[were] not reflected in any treatment notes or medical records").

The ALJ also discounted Dr. Cole's severe restrictions on the grounds that they "conflict[ ] with other substantial medical evidence contained within the record.'" **Wagner**, 499 F.3d at 849 (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)). For instance, she precluded Plaintiff from any operation of foot or hand controls. Plaintiff, however, testified that she regularly drove without any trouble and reported that she prepared meals which could take up to two hours. Pulmonary function tests regularly revealed, at worst, a minimal obstructive defect and sometimes, including the month of Plaintiff's alleged disability onset date, were normal. See **Reed v. Barnhart**, 399 F.3d 917, 921 (8th Cir. 2005) (noting that the court "[has] upheld an ALJ's decision to discount a treating physician's MSS

where the limitations listed on the form 'stand alone' and were 'never mentioned in [the physician's] numerous records or treatment' nor supported by 'any objective testing or reasoning'") (second alteration in original).

Plaintiff correctly notes that "[a]n MSS is a checklist evaluation in which the responding physician ranks the patient's abilities, and is considered a source of objective medical evidence." **Id.** (internal quotations omitted). An MSS may not be rejected solely because an ALJ "considers this method of evaluation deficient." **Id.** In the instant case, the ALJ did not do so. He rejected Dr. Cole's MSS because it was inconsistent with her treatment notes and the objective evidence. In **Johnson v. Astrue**, 628 F.3d 991 (8th Cir. 2011), the court noted the use by one of the claimant's treating physicians of the MSS form – "consist[ing] of a series of check marks assessing [RFC]" – and held that the ALJ may discount the "conclusory opinions" reflected in the MSS "if contradicted by other objective medical evidence in the record." **Id.** at 994 (internal quotations omitted). See also **Anderson**, 696 F.3d at 794 ("[A] conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little or no elaboration.") (internal quotations omitted).

Additionally, an ALJ may discount a treating physician's opinion that is based on the claimant's subjective complaints. See **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ properly gave treating physician's opinion non-controlling weight when, among other things, that opinion was largely based on claimant's subjective complaints); **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily

on claimant's subjective complaints and not on objective medical evidence). The ALJ's assessment of Plaintiff's credibility is addressed below.

Plaintiff further argues that the ALJ erred by not providing a narrative discussion of his RFC findings, as required by Social Security Ruling 96-8p. "[S.S.R. 96-8p] cautions that a failure to make [a] function-by-function assessment [of a claimant's RFC] could 'result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 96-8p, 1996 WL 374184, *1). An ALJ does not, however, fail in his duty to assess a claimant's RFC merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Id.** Instead, an ALJ who specifically addresses the areas in which he found a limitation but is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68. Additionally, an "ALJ need not provide a narrative discussion immediately following each statement of an individual limitation in the RFC, if the court can otherwise discern the elements of the ALJ's decision-making." **Jones v. Astrue**, 2011 WL 4445825, *10 (E.D. Mo. Sept. 26, 2011) (citing Depover, 349 F.3d at 567). See also **Hilgart v. Colvin**, 2013 WL 2250877, *4 (W.D. Mo. May 22, 2013) (finding that a requirement that an ALJ "follow each RFC limitation with a list of specific evidence on which the ALJ relied" to be inconsistent with the court's duty to base its decision on "all the relevant evidence") (internal quotations omitted). In the instant case, after summarizing all the record before him, including the medical reports and Drs. Cole's and Wheeler's assessments, the ALJ found that Plaintiff had an RFC more restrictive than Dr. Wheeler's assessment and less restrictive than

Dr. Cole's assessment. "[T]he burden of persuasion to prove disability and demonstrate RFC [is] on the claimant." **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010). Plaintiff has not established that the ALJ erred in assessing her RFC.

Credibility Assessment. "'As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is.'" **Perkins v. Astrue**, 648 F.3d 892, 901 (8th Cir. 2011) (quoting Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). The ALJ found that Plaintiff suffered from pain and breathing difficulties, but not to the extent she alleged. Plaintiff challenges this finding.

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)); accord **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011).

When finding Plaintiff not fully credible, the ALJ properly considered the lack of supporting objective evidence. See **Id.** (affirming the appropriateness of such consideration). For instance, pulmonary function tests, x-rays, CT scans, and MRIs routinely failed to reveal any condition severe enough to support Plaintiff's allegations. Straight leg raises and range of motion testing were also unsupportive. And, although Plaintiff sporadically complained of depression and anxiety and sometimes was tearful during an exam, she routinely had a good mood and affect and fair insight and judgment. The relevant lack of supporting evidence includes the absence of any restrictions placed on Plaintiff by any of her treating

physicians during their treatment of her.  See **Teague v. Astrue**, 638 F.3d 611, 615 (8th Cir. 2011).

Another proper consideration by the ALJ were Plaintiff's activities of daily living, including taking care of two children, three dogs, and a parrot; attending church weekly; grocery shopping twice a week; and preparing meals, including some which take two hours. See **McDade v. Astrue**, 720 F.3d 994, 998 (8th Cir. 2013) (affirming ALJ's adverse credibility determination when claimant's activities of daily living included cooking, taking care of his dogs, using a computer, driving with a neck brace, and shopping for groceries with the use of an electric cart).

Plaintiff argues that a good earnings record may support a claimant's credibility.  See **Finch**, 547 F.3d at 936 (noting that an *unbroken* earnings record of thirty-eight years supported claimant's credibility but did not outweigh ALJ's decision finding other factors detracted from such).  The ALJ correctly found she had a poor record.  This a proper detraction from her credibility.  See **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006); **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006).

Another proper consideration when evaluating a claimant's credibility is the presence of any precipitating or aggravating factors.  See **Wagner**, 499 F.3d at 851.  Plaintiff alleged a disability onset date of May 1, 2009.  Two weeks later, she reported to Dr. Cole that she was "actually doing quite well."  (R. at 249.)  Five months later, she attempted to return to a job that required heavy lifting and exposure to airborne irritants.  She did not attempt to work at a job less physically or environmentally demanding.  Moreover, the impairments cited by

Plaintiff as disabling, i.e., asthma and fibromyalgia, are ones that Plaintiff had long before her alleged disability onset date. There is nothing in the record to indicate that there was any aggravating event that made either condition worse.[10]

Consultative Examination. Plaintiff next argues that the ALJ did not fulfill his duty to develop the record when he failed to order a mental consultative exam and when he failed to incorporate in his RFC any limitations caused by her depression and anxiety.

In **Jones**, 619 F.3d at 969, the court held that

[a] disability claimant is entitled to a full and fair hearing under the Social Security Act. Where the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations, the claimant has received a full and fair hearing. The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.

(Internal quotations and citation omitted.)

As with her asthma and fibromyalgia, Plaintiff's depression predated her alleged disability onset date. In January 2005, it was described as stable. In February 2007, it was worsening. In April 2007, it was improving. In May 2009, it was described as not being worse. In February 2010, the month when Plaintiff applied for DIB and SSI, she saw Dr. Cole twice, neither time citing depression as a problem.[11] Indeed, she did not cite depression or anxiety when applying for disability. In **Dunahoo**, 241 F.3d at 1039, the court held that

_____

[10]In support of her challenge to the ALJ's credibility determination, Plaintiff cites her own testimony. This circular reasoning is unavailing.

[11]Plaintiff correctly notes that she was diagnosed with major depressive disorder. She omits, however, the consistent characterization by Dr. Cole of that disorder being mild.

"[t]he fact that [claimant] did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed." In the instant case, Plaintiff also did not cite depression or anxiety in her hearing testimony as an impairment that limited her ability to work.

For the foregoing reasons, the ALJ did not err by not ordering a mental consultative examination.

Additional Material before the Appeals Council. After the ALJ rendered his adverse decision in June 2011, Plaintiff submitted additional medical records to the Appeals Council. Some of these records, e.g., Dr. Reddy's March 2011 records and the November 2010 CT scan of her sinuses, predated that decision. Others, e.g., Dr. Klein's records, postdated the decision. Plaintiff argues the Commissioner "erred in failing sufficiently to account for such evidence, and in failing to include additional limitations." (Pl.'s Br. at 27, ECF No. 23.)

"An application for disability benefits remains in effect only until the issuance of a 'hearing decision' on that application." **Myers v. Colvin**, 721 F.3d 521, 526 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.620(a), 416.330). New evidence submitted to the Appeals Council is considered only to the extent it "relates to the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b). When that decision is challenged in an action for judicial review, the Court determines whether it is "supported by substantial evidence on the record as a whole, including the new evidence." **Davidson v. Astrue**, 501 F.3d 987, 990 (8th Cir. 2007). "'To be new, evidence must be more than merely cumulative of other evidence in the record.'" **Perks v. Astrue**, 687 F.3d 1086, 1093 (8th Cir. 2012)

(quoting <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1069 (8th Cir. 2000)). And, although "[t]he Appeals Council's failure to consider [new, material] evidence may be the basis for a remand," **Whitney v. Astrue**, 668 F.3d 1004, 1006 (8th Cir. 2012), the Appeals Council "is not expressly required by the regulations to state its rationale for denying review," **Riggins v. Apfel**, 76 F.Supp.2d 707, 709 (W.D. Mo. 1999).

In the instant case, the Appeals Council stated that it had considered new evidence and identified that evidence by source and dates. <u>Cf.</u> **Lamp v. Astrue**, 531 F.3d 629, 632-33 (8th Cir. 2008) (remanding case in which it could not be discerned whether the Appeals Council considered only one letter in a particular exhibit or two). The question then is whether after considering the new evidence relating to the period before June 29, 2011, there is substantial evidence on the record as a whole to support the ALJ's decision. There is.

The findings of two tests performed prior to June 2011 were normal. The March 2011 visits to Drs. Reddy and Cole were, at best, cumulative. The May 2011 visit to Dr. Cole was for back pain for the past two weeks.[12] Five months later, she informed Dr. Klein that the back pain had existed for one year. The complaints of back pain reflected in the records of Drs. Cole and Klein and the physical therapy records depend on Plaintiff's report of such. The ALJ, however, found Plaintiff not to be fully credible. Moreover, as noted by the Commissioner, the ALJ's RFC findings limiting Plaintiff's lifting, standing, and walking do

---

[12]The Court notes that when Plaintiff first sought medical treatment for her back pain, in September 2004, she described it as having begun five years earlier.

take into consideration her back pain. Plaintiff has failed to establish that the new evidence before the Appeals Council calls for greater restrictions.

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner**, 646 F.3d at 556 (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  22nd  day of August, 2014.